UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Thomas James Gillis,
     Claimant

     v.                             Civil No. 08-cv-225-SM
                                         Opinion No. 2009 DNH 051
Michael J. Astrue,
Commissioner, Social
Security Administration,
     Respondent

**O R D E R**

Pursuant to 42 U.S.C. § 405(g), claimant, Thomas Gillis, moves to reverse the Commissioner's decision denying his applications for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382.  The Commissioner, in turn, moves for an order affirming his decision.  For the reasons given below, the decision of the Commissioner is affirmed.

**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of

> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB

decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §

405(g) as the standard of review for SSI decisions).  However,

the court "must uphold a denial of social security . . . benefits

unless 'the [Commissioner] has committed a legal or factual error

in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of

HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson,

490 U.S. 877, 885 (1989)).


        As for the statutory requirement that the Commissioner's

findings of fact be supported by substantial evidence, "[t]he

substantial evidence test applies not only to findings of basic

evidentiary facts, but also to inferences and conclusions drawn

from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-

18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730

(2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than

[a] mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a

conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st

Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401

(1971)).  Finally, when determining whether a decision of the

Commissioner is supported by substantial evidence, the court must

"review[] the evidence in the record as a whole."  Irlanda Ortiz
v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (quoting
Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).[1]

## Background

The parties have submitted a Joint Statement of Material
Facts (document no. 9).  That statement is part of the court's
record and will be summarized here, rather than repeated in full.

As of his alleged onset date, November 7, 2005, Gillis was
thirty-nine years old.  He has a GED and his past relevant work
includes, among other employment, a job at a convenience store.

Beginning with an emergency room visit on August 18, 2005,
Gillis has undergone a course of evaluation and treatment,
including physical therapy, for pain in his neck.  He filed the
applications for benefits at issue here on October 28, 2005.  On
February 5, 2006, he hit his head on a refrigerator door and
developed a large left frontal and left caudate hemorrhage.

---

[1] "It is the responsibility of the [Commissioner] to
determine issues of credibility and to draw inferences from the
record evidence.  Indeed, the resolution of conflicts in the
evidence is for the [Commissioner], not the courts."  Irlanda
Ortiz, 955 F.2d at 769 (citations omitted).  Moreover, the court
"must uphold the [Commissioner's] conclusion, even if the record
arguably could justify a different conclusion, so long as it is
supported by substantial evidence."  Tsarelka v. Sec'y of HHS,
842 F.2d 529, 535 (1st Cir. 1988).

Subsequent testing revealed a large intraparenchyma with hemorrhage in the left frontal and orbitofrontal regions with extensions to ventricles, and an absent left P1 and prominent left posterior communicator.

In the "Work History Report" Gillis filed in conjunction with his applications for benefits, he indicated that from 2001 through 2004 he held the job title of "stocking shelves/sandwich mak[ing]" in a convenience store.  (Administrative Transcript (hereinafter "Tr.") at 54.)  He described that job in the following way: "Cook/Delivery Driver: Cook pizza, make sandwiches, deliver pizzas & subs, and stock beer & soda cooler." (Id. at 57.)  He reported that in that job, he walked for one hour per day; stood for four hours per day; sat only when delivering orders (for three hours per day); handled, grabbed, or grasped big objects for two hours per day; reached for one hour per day; and wrote, typed, or handled small objects for four hours per day.  (Id.)  He also reported that he did no climbing, stooping, kneeling, crouching, or crawling (id.), and that the heaviest weight he lifted was twenty pounds and that he frequently lifted two pounds (id.).

In June, 2006, as part of an agreement in an unrelated matter, Gillis underwent a psychological evaluation conducted by

Dr. Michael Vanaskie.  Dr. Vanaskie began his discussion of Gillis's mental status by stating that "there were no indications during the evaluation of any serious psychopathology."  (Tr. at 208).  Dr. Vanaskie also noted:

> The results of the MCMI-III, a 175-item personality measure, suggest that Thomas has a distinct tendency toward avoiding self-disclosure.  It is likely that this tendency is a combination of factors including his unwillingness to divulge personal issues, problematic or not, given the use of this assessment, as well as broad deficits in his introspectiveness and psychological mindedness.  During my conversations with him, it was clear that Thomas does not think in terms of his psychological motives or feelings.  In addition, he displayed an extreme attitude regarding an external locus of control.  For Thomas, he feels that he is acted upon rather than being the responsible party in many of the difficulties he has faced in the past.  The MCMI-III profile has been modified to account for this low self-revealing inclination.  . . .  What we see from Thomas' responses is a man who is currently trying very hard to conform to the expectations of others, particularly those in authority. . . .
>
> On the MMPI-II, Thomas' tendency toward non-self disclosure was even more pronounced.  The MMPI-II is a 567-item personality measure that is widely used in a variety of mental health settings.  It contains several scales that allow us to look at whether or not the subject approached this task in an open and straightforward fashion.  What is immediately apparent is that Thomas denies most of the common human foibles that beset the large majority of the population.  These fifteen items are generally answered "true" since they are worded in such a way as to be absolute.  By endorsing these items in the negative direction, Thomas was saying that he never acts in a way that is contrary to accepted standards.  Most people would acknowledge that they occasionally break the rules by occasionally telling a lie or using swear[ ] words.  By presenting himself in such a favorable light, the remainder of the MMPI-II is highly questionable.

> . . . [A] more detailed analysis of the MMPI-II
> would be open to a great deal of question given the
> extreme defensiveness that [Thomas] exhibited in his
> responses.

(Id. at 209-10.)  In the section titled "Summary and

Recommendations" Dr. Vanaskie wrote:

> While this mental health evaluation does not reveal the
> presence of any significant psychiatric disorder,
> Thomas' presentation and his history suggest the
> presence of a significant personality disorder.  By his
> history of illegal activity dating back to his middle
> adolescence, Thomas would meet the criteria for a
> diagnosis of an Antisocial Personality Disorder.  His
> extreme sense that life acts upon him rather than he
> being responsible for his misfortune, is part and
> parcel of the difficulties that he has faced in life
> and will continue to face in life until he recognizes
> how he can manage himself better.   Thomas has many
> distorted ideas about himself.  In his conversations
> with me, Thomas displayed many cognitive distortions
> that are typical of individuals with his history. . . .
>
>         . . . .
>
>         The question of whether or not Thomas requires any
> mental health counseling is somewhat unclear.  On one
> hand, he does not have any significant psychopathology.
> While he displays some indications of Depression, this
> may in fact be due to his situation rather than some
> emotional and long-standing problem.  His lack of
> psychological mindedness and his tendency to avoid
> self-disclosure also clouds the picture as to his true
> emotional status at this time.  On the other hand, it
> is clear that Thomas suffers from significant cognitive
> distortions and thinking errors that will continue to
> create problems for him as he moves forward in his
> life. . . .  [H]is interpersonal relationships will
> continue to be difficult for him. . . .
>
>         . . . .

> For now, I would not diagnose Thomas with any mental health disorder other than the aforementioned Antisocial Personality Disorder by history.

(Id. at 210–11.)  A "Psychiatric Review Technique" form completed by Dr. Nicholas Kalfas in April 2006 listed the following "Medical Disposition(s)": (1) Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty"; and (2) "Insufficient Evidence".  (Id. at 191.)

Regarding Gillis's ability to perform work-related activities, in March 2006, Dr. Joseph Cataldo, a non-treating, non-examining medical source, conducted a Physical Residual Functional Capacity Assessment in which he determined that Gillis could: (1) lift and carry up to ten pounds frequently and up twenty pounds occasionally (Tr. at 184); (2) stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday (id.); (3) sit (with normal breaks) for a total of about six hours in an eight-hour workday (id.); (4) push and/or pull with no limitation other than that established for lifting and carrying (id.); (5) climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl occasionally (id. at 185); (6) perform reaching, handling, fingering, and feeling without limitation (id. at 186).  Dr. Cataldo also determined that Gillis had no visual, communicative, or environmental limitations.  (Id. at 186–87.)  In April 2007,

7

physical therapist Rachel Heath tested Gillis and determined that
he could lift and carry ten pounds frequently and twenty pounds
occasionally; could bend, kneel, squat, climb, stand, walk, sit,
and reach occasionally and could perform fine motor skills
frequently; and was able to return to work, with the
modifications noted, "part-time at 4 hours/day and 5 days/week."
(Id. at 268.)

In June 2007, an Administrative Law Judge ("ALJ") conducted
a hearing at which claimant was not represented by counsel.  When
asked by the ALJ to identify his worst medical problem, claimant
stated: "My forgetfulness, short-term memory, that I feel people
take advantage of. . . . I just can't remember nothing now.  I
have to write everything down to keep track, and I was never like
this before.  I have mood swings, anger problems now, easily
aggravated."  (Tr. at 354.)  Claimant offered no testimony about
his former job in a convenience store, and was asked no questions
about that job by the ALJ.

After the hearing, the ALJ issued a decision which included
the following findings:

> 3.  The claimant has the following "severe"
> impairments: focal mild extrusion C5-6, minimal focal
> protrusion at C6-7 without canal stenosis; early
> cervical degenerative disc disease; history of February
> 2006 large anterior L frontal intercranial hemorrhage,

cryptogenic; antisocial personality disorder; and history of substance abuse (20 CFR 404.1520(c) and 416.920(c)).

. . . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . . .

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of unskilled work at the light exertional level so long as he only occasionally performs postural activities and does not act in a supervisory capacity.

. . . .

6. The claimant is capable of performing past relevant work stocking shelves in a convenience store.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

(Tr. at 22-28.)  Based upon the foregoing findings, the ALJ ruled that Gillis was not under a disability from October 7, 2005, through the date of the decision, August 20, 2007.

## Discussion

According to claimant, the ALJ's decision should be reversed, and the case remanded, because the ALJ incorrectly determined that he was capable of performing his past relevant work in a convenience store.  On that basis, claimant asks the

court to remand his claim for further development of the record. For his part, the Commissioner asks the court to affirm his decision that claimant was not disabled because that decision was supported by substantial evidence.

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The issue in this case is whether Gillis was under a disability during the time for which he sought benefits.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage
> in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment
> which can be expected to result in death or which has
> lasted or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); <u>see also</u> 42 U.S.C. § 1382c(a)(3)(A) (setting out a similar definition of disability for determining eligibility for SSI benefits).  Moreover,

10

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he [she] would be hired if he applied for work.
> . . .

42 U.S.C. § 423(d)(2)(A) (pertaining to DIB benefits); see also

42 U.S.C. § 1382c(a)(3)(B) (setting out a similar standard for

determining eligibility for SSI benefits).

     In order to determine whether a claimant is disabled for the

purpose of determining eligibility for either DIB or SSI

benefits, the Commissioner is required to employ a five-step

process.  See 20 U.S.C. §§ 404.1520 (DIB) and 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform past
> relevant work, then the application is denied; 5) if
> the [claimant], given his or her residual functional
> capacity, education, work experience, and age, is
> unable to do any other work, the application is
> granted.

11

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).  The claimant bears the burden of proving that he is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). He must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

> In assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witness; and (3) the plaintiff's educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

According to claimant, the ALJ erred in making his step-four determination in two ways: by failing to elicit more evidence from him concerning his previous convenience store job, and by failing to call a vocational expert to provide testimony.[2]  The Commissioner disagrees.

---

[2] Claimant does not appear to challenge the ALJ's determination that he had the physical residual functional capacity to perform a full range of unskilled work at the light exertional level, so long as he only occasionally performed postural activities.

The relevant Social Security regulations describe step four in the sequential evaluation process in the following way:

> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

20 C.F.R. § 404.1520(a)(4)(iv).  Those regulations continue:

> Your impairment(s) must prevent you from doing your past relevant work.  If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment . . . with the physical and mental demands of your past relevant work.  (See § 1560(b).)  If you can still do this kind of work, we will find that you are not disabled.

Id. § 404.1520(f).

Regarding step four, the court of appeals for this circuit has explained:  "At step four the initial burden is on the claimant to show that [he] can no longer perform [his] former work because of [his] impairments." Manso-Pizarro, 76 F.3d at 17 (citing Santiago v. Sec'y of HHS, 944 F.2d 1, 5 (1st Cir. 1991)). To meet that burden, a "claimant must initially produce relevant evidence of the physical and mental demands of [his] prior work." Santiago, 944 F.2d at 5 (citing Pitchard v. Schweiker, 692 F.2d 198, 201 & n.2 (1st Cir. 1982); May v. Bowen, 663 F. Supp. 388, 394 (D. Me. 1987)).  The evidence a claimant produces "may be

13

testimonial or take the form of historical or subjective statements made in the application or other documents provided by the agency, but claimant must at least furnish some minimal information about the activities that [his] past usual work required, <u>including those which can no longer be performed</u>." <u>Santiago</u>, 944 F.2d at 5 (citing <u>May</u>, 663 F. Supp. at 393; <u>Pelletier v. Sec'y of HEW</u>, 525 F.2d 158, 161 (1st Cir. 1975)) (emphasis added).  Then, "[t]he claimant must . . . describe those impairments or limitations which [he] <u>says</u> [he] has . . . so as to 'raise the point to the [Commissioner]' . . . how current functional capacity . . . precludes the performance of the particular prior job."  <u>Santiago</u>, 944 F.2d at 5 (citations omitted).  "In short, not only must the claimant lay the foundation as to what activities [his] former work entailed, but [he] must point out (unless obvious) – so as to put in issue – how [his] functional incapacity renders [him] unable to perform [his] former usual work."  <u>Id.</u>

    After the claimant meets his initial burden, then "the ALJ must compare the physical and mental demands of [the claimant's] past work with current functional capability."  <u>Manso–Pizarro</u>, 76 F.3d at 17 (citing <u>Santiago</u>, 944 F.2d at 5; 20 C.F.R. § 404.1560(b)).  "In making a step four appraisal, the ALJ is entitled to credit a claimant's own description of [his] former

job duties and functional limitations, but has some burden
independently to develop the record." <u>Manso-Pizarro</u>, 76 F.3d at
17 (citing <u>Santiago</u>, 944 F.2d at 5-6).  The ALJ's duty to develop
the record is only triggered, however, "<u>once alerted by the
record to the presence of an issue</u>."  <u>Santiago</u>, 944 F.2d at 6
(citing <u>May</u>, 663 F. Supp. at 394).

According to claimant, "the ALJ in this case should have
developed the record more fully through testimony from the
claimant in regard to the convenience store job, as well as
calling a Vocational Expert (VE) to give testimony."  In
claimant's view, Dr. Vanaskie's report alerted the ALJ to the
presence of an issue, <u>i.e.</u>, his mental state, that required the
ALJ to undertake "a more in depth examination of claimant's job
duties at the convenience store."  Claimant is mistaken, because
he had not carried his "initial burden . . . [of] show[ing] that
[he] can no longer perform [his] former work because of [his]
impairments."  <u>Manso-Pizarro</u>, 76 F.3d at 17.

Claimant's mental state, standing alone, was not an "issue"
as that concept is described in <u>Santiago</u>.  Rather, for a claimant
to raise an issue that triggers an ALJ's duty to further develop
the record, he must do more than identify a functional
incapacity; he "must point out . . . how [his] functional

15

incapacity renders [him] unable to perform [his] former usual work."  944 F.2d at 5.

Here, claimant does not identify anything in Dr. Vanaskie's report,[3] or in his own description of his mental state, that should have alerted the ALJ to a need for further inquiry into his ability to perform his former convenience store job.  He simply does not say how his mental health issues precluded him from performing that – or any other – job.  Put another way, this record includes neither "statements as to which past work requirements can no longer be met and the reasons for [claimant's] inability to meet those requirements," Curtis v. Sullivan, 808 F. Supp. 917, 923 (D.N.H. 1992), nor "medical evidence establishing how the impairment limits [claimant's] ability to meet the physical and mental requirements of the work," id.  Thus, as in Santiago, "neither claimant's testimony nor the other evidence of record goes far enough to raise a meaningful issue as to [claimant's] incapacity to perform [his] prior work."  944 F.2d at 6.

---

[3] Claimant also devotes several paragraphs of his memorandum to a psychological evaluation conducted by Dr. Norman Kinsler about two months after the ALJ issued his decision.  According to claimant, "Dr. Kinsler's report certainly confirms and expands upon the evaluation administered by Dr. M.J. Vanaskie."  That may or may not be true, but, Dr. Kinsler's evaluation is of no moment, as judicial review of the ALJ's decision must be based "solely on the evidence presented to the ALJ."  Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001).

This case is readily distinguishable from <u>May</u>, which provides a good illustration of what does trigger an ALJ's duty to further develop the record.  As the judge in that case explained:

> In the present case, plaintiff met her burden of production by asserting, in the disability report filed November 11, 1981, that her past jobs "have all been pressure jobs," and through the presentation of medical evidence that she has a long-standing history of arteriosclerotic vascular disease, which places her at risk of a major stroke.  Although the ALJ did inquire briefly into plaintiff's prior work experience, Record at 30-32, the record discloses neither the requisite investigation nor the explicit findings as to the physical and mental demands of her former work contemplated by 20 C.F.R. § 404.1520(e), as interpreted by SSR 82-62.

<u>May</u>, 663 F. Supp. at 394.  In <u>May</u>, the claimant identified a medical diagnosis, <u>i.e.</u>, a risk of stroke, that was, on its face, incompatible with an identified element of all of her past relevant work, <u>i.e.</u>, pressure.  Here, by contrast, claimant has identified nothing in his medical and/or mental health records that would call into question his ability to do his former convenience store job, as he described that job in his Work

History Report.[4]   Thus, claimant has not pointed to any issue that triggered the ALJ's duty to further develop the record.

Finally, while claimant correctly cites <u>Currier</u> for the proposition that the Commissioner "has certain responsibilities with regard to the development of the evidence," 612 F.2d at 598, the <u>Currier</u> court also stated that it did "not see such responsibilities arising in run of the mill cases," <u>id.</u>  Like the claimant in <u>Currier</u>, claimant in this case was unrepresented at his hearing, <u>see id.</u>, but other than that, this case does not involve the various other "special circumstances," <u>id.</u>, present in <u>Currier</u>.   Those circumstances include the following:

> Dr. MacAllister's opinion upon which the administrative
> law judge principally relies, that appellant can work
> but at another location, is devoid of any reasoned
> analysis of why this man, whom the Air Force found
> functionally inadequate and whom Dr. MacAllister
> himself indicated was not a malingerer, would be able
> to function any more successfully in the future than he
> did at his most recent job in the woolen mill.
> Moreover, the only evidence from Dr. MacAllister
> consisted of clinical notes.  The notes are
> unaccompanied by any formal opinion and diagnosis
> explaining to what degree and in what respect appellant
> may be impaired by his mental illness and relating

---

[4] Claimant appears to criticize the ALJ for relying solely on the Work History Report as a source of information about his convenience store job, but does not challenge the accuracy of the information reported therein.  Moreover, claimant does not proffer what he would have added to that information had he been questioned by the ALJ at his hearing, or how any additional information would have lead the ALJ to conclude that he was incapable of performing his past relevant work.

> these deficiencies to the requirements of his former
> job and other available jobs.  Given the absence of
> developed information of this type and given the
> otherwise pessimistic picture of appellant's
> potentialities presented by the remaining evidence
> including the report of the psychiatric social worker,
> we do not think that Dr. MacAllister's conclusory
> reflections as to appellant's employability, see 20
> C.F.R. § 1524(c) (1979), gleaned by the administrative
> law judge from Dr. MacAllister's office notes,
> constitute by themselves evidence that a reasonable
> mind would find adequate to reach the result arrived at.

Id. at 597.  Unlike Currier, this case involves neither

conflicting evidence (with by far the smaller fraction favoring

the ALJ's decision) nor a claimant who "seems obviously mentally

impaired to some degree, having been found unemployable by [one

employer] and effectively so by [a second employer] and having

been diagnosed as having a non-trivial psychiatric condition."

Id. at 598.  In comparison with the situation in Currier, in

which the claimant had been discharged from one job because of

the same mental impairment which formed the basis for his

disability claim, and told that he would be fired if he returned

from a leave of absence from a second job, because of that same

mental impairment, see id. at 595, Gillis's case is, in the words

of Currier, "run of the mill," id. at 598.  Thus, Currier does

not compel a conclusion that the ALJ in this case had a duty to

more fully develop the record.

Finally, while perhaps not relevant to the foregoing analysis, the court notes the ALJ <u>did</u> take claimant's mental state into account in making his step-four determination.  First, the ALJ found that claimant had a residual functional capacity ("RFC") for only unskilled work, based on his testimony concerning memory loss.  And, in addition, the ALJ found that claimant did not have the residual functional capacity for supervision, based on Dr. Vanaskie's diagnosis of Antisocial Personality Disorder.  Thus, even though claimant never presented the ALJ with an issue concerning his mental abilities to perform his convenience store job, the ALJ did consider the limitations of record and incorporated them into his decision.

Claimant also objects to the ALJ's failure to solicit the testimony of a vocational expert, for relying exclusively on his Work History report rather than soliciting testimony at the hearing, and for failing to refer to the Dictionary of Occupational Titles.  While it is not particularly clear, claimant appears to suggest that one or more of those forms of evidence was necessary to support the ALJ's determination that his former convenience store job was unskilled light-duty work he was capable of performing given his physical and mental RFC.

Claimant's argument misapprehends the administrative guidance relevant to making a step-four determination. Specifically, claimant appears to argue that the ALJ was required to compare his residual functional capacity with "not only the actual functional demands and job duties of [his] past relevant job, but also the functional demands of the job duties of the occupation as generally required by employers throughout the national economy." That is incorrect. The SSA Program Policy Statement captioned "Titles II and XVI: A Disability Claimant's Capacity to Do Past Relevant Work, in General," SSR 82-62 (PPS-80), 1982 WL 31386 (S.S.A.), which claimant cites in his memorandum, provides that

> [t]he RFC to meet the physical and mental demands of jobs a claimant has performed in the past (<u>either</u> the specific job a claimant performed <u>or</u> the same kind of work as it is customarily performed throughout the economy) is generally a sufficient basis for a finding of "not disabled."

<u>Id.</u> at *3 (emphasis added). A second Program Policy Statement, "Titles II and XVI: Past Relevant Work – The Particular Job or the Occupation as Generally Performed," SSR 82-61 (PPS-71), 1982 WL 31387 (S.S.A.) is to similar effect, and provides:

> Under sections 404.1520(e) and 416.920(e) of the regulations, a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform:

21

> 1. The actual functional demands and job duties of a particular past relevant job; <u>or</u>
>
> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

<u>Id.</u> at *2 (emphasis in the original).  Where, as here, the ALJ determined that claimant was able to perform the actual duties of his former convenience store job, he was under no obligation to determine whether claimant retained the RFC to perform that job as it is generally performed in the national economy. Accordingly, neither the absence of testimony from a vocational expert nor the absence of a reference to the Dictionary of Occupational Titles in the ALJ's decision is of significance.


### Conclusion

For the reasons given, claimant's motion to reverse and remand (document no. 7) is denied, and the Commissioner's motion for an order affirming the ALJ's decision (document no. 8) is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.


**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

April 6, 2009

22

cc:  D. Lance Tillinghast, Esq.
     Robert J. Rabuck, Esq.